UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER L. GENTRUP, et al on behalf of themselves and all others similarly situated | : : | Case No. 1:07CV430 |
| Plaintiffs, | : | Judge Spiegel Magistrate Black |
| vs. | : | PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR |
| RENOVO SERVICES, LLC, et al. | : | CONDITIONAL CERTIFICATION |
| Defendants | : | |

I. INTRODUCTION

This case is filed as a collective action under the Fair Labor Standards Act, 29 U.S.C. § 216 (b), seeking the payment of overtime for repossession agents, who were improperly classified as independent contractors, by Renovo Services, LLC and its three wholly-owned subsidiaries Recovery One, LLC, Cyber Asset Recovery, LLC and Ascension Recovery, LLC. Plaintiffs move the Court to conditionally certify this case as a collective action and to supervise the sending of notice of this action to similarly-situated employees of Defendants who may be entitled to recover overtime as a result of common wage practices. To facilitate notice, Plaintiffs request that the Court direct Defendants to provide to Plaintiffs' counsel the names and last-known mailing addresses of similarly-situated individuals.

Section 216(b) of the FLSA provides for an opt-in procedure whereby similarly-situated employees may join with named class representatives to prosecute their claims. The repossession agents form a cohesive group of similarly-situated employees. The agents perform the same job

1

duties and are paid in the same manner, a flat rate for each repossession. Defendants uniformly classify the agents as independent contractors and, therefore, exempt from overtime pay requirements. The duties and working conditions of the agents, however, indicate that they are employees for purposes of the FLSA.

Court supervised notice and an opt-in period will facilitate consolidated resolution of wage claims based on common law and facts. Adjudicating the mis-classification issue in one proceeding will avoid proliferation of individual lawsuits that could result in inconsistent rulings and the unnecessary waste of judicial resources.

II. FACTS

A. **The Business of Renovo**

Renovo Services and its subsidiaries, Recovery One, Cyber Asset Recovery, and Ascension Recovery, are engaged in the business of recovering various types of collateral for their customers. Each of the subsidiaries operates in a specific geographic area. Ascension operates in three states in the Southeast; Cyber, in four states in the Mid-West, and Recovery One, in eight states in the Mid-West and Southeast. The states are listed on Renovo's website, "About Us" www.renovoservices.com (Exhibit 1). The website describes how Renovo's initial growth came from the acquisition of local companies and retention of local management and expertise. Melding these companies together, Renovo offers clients standardized performance using web-based recovery software and a fleet of company-owned trucks. (Exhibit 1) Each subsidiary has a Regional Manager, currently Robert Howard, for Recovery One; Russell Keith, for Ascension; and Jack Hunter, for Cyber. Field Area Supervisors, who report to them, supervise the agents.

B. **The Repossession Agents**

There are more than 100 repossession agents working in various territories served by Renovo. Agents sign agreements characterizing them as independent contractors. Renovo does not withhold payroll or income taxes from their pay checks and issues 1099's for their services. The agents are treated in most respects, however, as employees.

Repossession agents repossess a wide variety of vehicles, including cars, trucks, SUVs, motorcycles, all terrain vehicles and types of water craft and transport vehicles to the company's lots or sites designated by the customer. ( Affidavit of Chris Gentrup ¶9; Declaration of Jimmy Yarbrough, ¶ 5) They receive their assignments by email via a web-based system called Recovery Database Network (RDN) which links lenders, repossession companies and the agents. Orders are transmitted with mapping software that directs the agent to the location of the vehicle and gives location updates. Agents submit a variety of reports and updates online and follow common company practices and procedures in making repossessions.

Most of the repossession agents drive company trucks. On its website, Renovo advertises that "Numbering over 100 units, Renovo operates the largest company-owned fleet of repossession trucks of any recovery company in the country, bar none." (Exhibit 2, News; Read More ) The trucks are equipped with GPS systems which provide supervisors with information on the daily mileage, hours of operation and stops made by individual agents, as well as truck location. (Affidavit of Chad Whitmer, ¶12 ; Declaration of Jones, ¶15, Ex 3 and 4.)

Agents who drive Renovo's trucks sign standard Truck Agreements. ( Affidavit of Gentrup ¶5, Ex.3; Declaration of Yarbrough, ¶ 4, Ex. 1) The trucks are to be used exclusively for Renovo's repossessions. The company pays for gas and all required repairs and maintenance and

3

maintains insurance on the vehicles. Agents are responsible for keeping the vehicle clean and providing condition reports and taking the vehicles to be serviced. Agents who drive a company truck pay a "rental fee" for the truck which is subtracted from the flat rate paid for each repossession. (Aff. of Gentrup, ¶ 8; Decl. of Yarbrough, ¶ 6 .) Agents using their own trucks are paid the same flat rate but without the deduction. (Declaration of Fred Schwartz ¶7; Aff. of Whitmer, ¶11. )

Agents are supervised by Field Agent Supervisors who communicate with them primarily by email or cell phone. The role of the FAS is to manage the agents in the field so the company can meet repossession goals. (Aff. of Whitmer, ¶ 6.) Agents are given goals for the number of repossessions they must accomplish and the number of hours the company wants the truck to be on the road, or "running." Each of the Renovo trucks is expected to recover 20 units a week. If this goal is not met, the truck is expected to be on the road 22 hours a day, with two drivers working opposite shifts. (Aff. of Whitmer; ¶ 16. Decl. of Yarbrough ¶ 10; Decl. of Jones, ¶11. ) Agents driving their own trucks have the same high numerical goals. (Decl. of Schwartz, ¶ 14)

To meet the hours requirements, agents are urged to hire an apprentice to work a split shift and if they fail to do so, the company hires an agent to split the truck. For example, in the busy Louisville area, a second agent was hired by the company to split the truck used by Aaron Jones. FAS Chad Whitmer scheduled alternating 12-hour shifts for the two drivers. Using the GPS software, Whitmer was able to determine the total run time of the truck, which at one point was slightly less than 24 hours a day. (Aff. of Whitmer, ¶ 19; Decl. of Jones, ¶ 15, Ex. 3.) If two agents didn't have the truck running sufficient hours, the company could hire a third agent for the truck.( Decl. of Jones, ¶15, Ex. 5).

Agents are expected to work 10-12 hours per day and preferably six days a week. (Aff. of Whitmer, ¶ 21, Ex. 4.) Agents were directed to work on sundays to pick up units. (Aff. of Whitmer, ¶22, Ex. 6.) To meet the hours and recovery expectations, agents worked well over 40 hours a week, sometimes up to 90 hours a week (Aff. of Whitmer, ¶14, up to 90 hours a week; Decl. of Yarbrough, ¶12, up to 90 hours a week; Decl. of Jones, ¶17, 60-70 hours in truck; Aff. of Gentrup, ¶ 17, 60-70 hours in truck; and Decl. of Schwartz, ¶16, 40-60 hours.)

For working these long hours, agents are paid solely according to the number of their repossessions and receive no overtime. Extra hours do not necessarily translate into additional revenue since the number of repossessions depends on orders assigned by the company. Agent Jones described how he ran his truck although he had no work, simply to show that the truck was running, to comply with employer instructions. (Decl. of Jones, ¶18.)

III. ARGUMENT

A. **Authority for Court-Supervised Notice**

The Supreme Court in <u>Hoffmann-LaRoche Inc. v. Sperling</u>,[1] held that the collective action provisions of the FLSA, 29 U.S.C. §216(b) authorize a trial court to supervise notice to potential plaintiffs. The Supreme Court reasoned that effectuation of the opt-in provisions depends on employees receiving accurate and timely notice concerning the pendency of the collective action so that they can make informed decisions about whether to participate.[2] In a

---

[1] *Hoffmann-LaRoche Inc. v. Sperling*, 493 U.S.165 (1989).(Court-supervised notice was approved in a case filed under the Age Discrimination in Employment Act of 1967, 29 U.S.C. 626 (b),which incorporates the FLSA's enforcement provisions, including its opt-in procedures.

[2] 493 U.S. at 170.

collective action the court has a managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way[3]. The question is not whether the Court has the power to authorize the notice, but whether the appropriate circumstances exist for the Court to exercise its authority in this manner.

B. **The Legal Standards Applicable to Conditional Certification**

Courts have generally adopted a two-tiered certification approach for deciding whether a suit can proceed as a collective action: conditional certification and decertification.[4] Initially, the Court must determine whether notice of the pending action and the opportunity to opt-in should be given to potential class members. Notice will usually be authorized if the plaintiff demonstrates that he is similarly situated to the other employees he seeks to notify of the pendency of the action. This is known as conditional certification. After notice has been sent and discovery completed, the defendant can file a motion for decertification, challenging the court's preliminary determination that other employees are similarly situated.[5]

Not all courts have agreed on what plaintiff must demonstrate, at the conditional certification stage, to show that employees are similarly situated. Most courts agree, however, that the standard is fairly lenient and that a "modest factual showing" is all that is required before a court authorizes notices to be sent to plaintiffs.[6] Some district courts have held that a plaintiff can demonstrate that potential class members are similarly situated for purposes of receiving

---

[3] Id. at 171.

[4] *Harrison v. McDonald's* Corp., 411 F. Supp.2d 862, 864-65 (S.D. Ohio 2005)

[5] *Olivio v. GMAC Mortgage Corp.*, 374 F. Supp.2d 545, 547-48, n. 2 (E.D. Mich. 2004)

[6] *Olivio*, 375 F. Supp.2d at 548

notice based solely upon allegations in a complaint of class-wide illegal practices while other courts have held that a plaintiff meets this burden by demonstrating some factual support for the allegations.[7] The Sixth Circuit has not yet decided which standard applies.

Courts requiring a factual showing have considered factors such as whether potential plaintiffs were identified; whether affidavits of potential plaintiffs were submitted; and whether evidence of a widespread discriminatory practice was submitted.[8] In *Thomas v. Speedway Superamerica, LLC*, also a mis classification case, this Court found that plaintiff could demonstrate she was similarly situated by "substantial allegations made in the complaint supported by affidavits.[9] To issue an opt in notice in an overtime case, the district court must find other employees exist who share similar job requirements and pay provisions.[10]

In *Speedway* this Court cited *Hunter v. Sprint Corp.*[11] for the proposition that at the first stage of the analysis, plaintiffs must make a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law. The showing required is not stringent, nor does similarly situated equal identically situated.[12]

---

[7]*Belcher v. Shoney's, Inc.*, 927 F.Supp. 249, 251 (M.D. Tenn. 1996): *Pritchard v. Dent Wizard Int'l Corp.* 210 F.R.D. 591 (S.D. Ohio 2002) Both cases recite the two standards but found that the Plaintiffs met their burden under either standard.

[8]*H&R Block, Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999)

[9]*Thomas v. Speedway Supermarkets, LLC*, 2005 U.S. Dist. LEXIS 45286 *14 (S.D. Ohio 9/13/2005).

[10] *Speedway* at *7, citing *Dybach v. Florida Dep't. Of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991)

[11]*Hunter v. Sprint Corp.* 346 F. Supp.2d 113 (D.D.C. 2004)

[12]. *Speedway,*, supra at *14, cites omitted.

## C. Plaintiffs Are Similarly Situated To Other Reposession Agents

The nine Plaintiffs are repossession agents formerly employed by Renovo and are similarly-situated to the class they seek to represent. The Plaintiffs share similar job requirements and pay provisions with other repossession agents and there is evidence demonstrating that the potential opt-in's were victims of a common policy or plan that ran afoul of the FLSA.

1. <u>Similar Job Requirements</u>

Renovo uses a common job description when advertising for repossession agents on its website for the three subsidiary companies. (Aff. of Gentrup, Exhibit 4, Job Opportunity postings for Cyber Asset, Ascension and Recovery One.) The announcements describe the role of the repossession agent as the field representative for all collateral recoveries. Successful job candidates must be able to locate and map out locations for the recovery of collateral and to use the RDN system to receive orders and receive updates on client orders. The essential job requirements are a high school diploma, clean driving record and access to and ability to use a computer.

The duties of the position are more fully described in the Independent Recovery Contractor Agreement (IRCA) signed by the agents. (Decl. of Jones, Ex 6 , Aff. of Gentrup, Ex. 2.) Exhibit A of the 2006 IRCA, pages 8 and 9 is Procedures and Guidelines for Engagement, Reporting and Cancellation of Assignments which is followed by page 10, a summary of the agent's procedures for assignment acceptance, progress reports, recovering vehicles, vehicle transportation and debtor vehicle redemption.

Repossession agents also receive reminders on company procedures and policies by email. An example is the February 9, 2007 email sent by Repossession Manager Leah Lawrence

to agents discussing how to fill out condition reports, updates and pay sheets, be a professional and follow the Fair Debt Collection Act. ( Decl. of Yarbrough, Exh. 9 )

Plaintiffs' affidavits and declarations describe how the job was performed on a daily basis. Agents receive their assignments via email over the RDN system, print out the orders and are expected to file their first report within 24 hours. Additional updates are due each 48 hours afterward. After recovery, agents remove personal property, submit an itemized list of the property and transport the vehicle to a company lot. A condition report is due within 12-24 hours of recovery. Agents later transport vehicles to auction or other locations or accept payment for the redemption of personal property or collateral if permitted by the company. (Aff. of Gentrup, ¶¶ 18-20; Decl. of Schwartz ¶13; Aff. of Whitmer,¶¶ 8-10 ; Decl. of Jones, ¶ 10).

Agents are given numerical goals for collateral recovery. Nearly all of the agents drive company vehicles and these individuals are also obligated to keep the trucks running for periods of time. E mails from the Regional Manager for Recovery One and the FAS show Renovo wanted the trucks running at least 20 hours a day and pushed drivers to be in their trucks for 12-hour shifts. (Decl. of Yarbrough, ¶ 10; Aff. of Whitmer ¶¶ 16-20; Decl. of Schwartz, ¶ 15.) Management pushed the agents to find apprentices to split their trucks. To resist driving a split truck, Aaron Jones asked Regional Manager Robert Howard if he could buy his own truck and keep his territory. Mr. Howard replied the only way Jones could keep his territory would be to keep the truck on the road 20 hours a day, like all other agents. (Decl. of Jones, ¶ 12.)

2. Similar Pay Provisions

Repossession Agents sign agreements designating them as independent contractors and setting the terms of payment for repossession work. Agents are paid a flat rate, $110.00 for an

9

involuntary repossession; $72.50 for a voluntary repossession. For those who drive a company vehicle, a rental fee is subtracted: $40.00 for involuntary and $10.00 for a voluntary repossession. (Aff. of Gentrup, Ex.2; Decl. Of Yarbrough ¶ 6; Declaration of Schwartz ¶7; Aff. of Whitmer, ¶ 11 ; Declaration of Jones, ¶5). The flat rates apply regardless of the number of hours worked.

### 3. Agents at Recovery One, Cyber and Ascension are Similarly-Situated

There is evidence that repossession agents function similarly in all three subsidiary companies. The Affidavit of Chad Whitmer shows common practices of Recovery One and Cyber Recovery. Whitmer began working as an agent for Recovery One in Southern Indiana. In the fall of 2006, he was directed by Recovery One Regional Manager Howard to begin working for Cyber Asset, which services Indiana. Whitmer had previously signed an independent contractor agreement and Truck Agreement with Recovery One and drove a company truck. When he began to work for Cyber, he did not sign new agreements and used the same truck for repossessions. He performed his job in the same manner and used the same forms and procedures. He was compensated by the same flat rate, minus the truck rental fee. (Aff. of Whitmer, ¶ 26 .)

Job openings for a new FAS at Ascension were advertised to Recovery One agents, indicating a common supervisory structure. (Affidavit of Whitmer, Exh. 1) When he was promoted to the FAS position, Whitmer used the GPS system which permitted him to view driving records for all Renovo vehicles and the data on the drivers was reported in the same manner. (Aff. of Whitmer, ¶ 12.) Agents from the three companies used the same forms to input information into the RDN. (See, eg. Decl. of Yarbrough, Exh. 8 forwarding an email concerning a condition report to the Regional Managers of Recovery One, Cyber and Ascension.)

As shown, Renovo uses a common job description when advertising for repossession agents for the three subsidiary companies. (Aff. of Gentrup, Exhibit 4.) In identical terms, the announcements describe the role of the repossession agent as the field representative for all collateral recoveries.

**D. Repossession Agents are Subject to a Common Policy or Plan**

Renovo treated its repossession agents as non-employees, exempt from the requirements of the Fair Labor Standards Act. Its treatment of the agents, however, indicates that as a matter of economic reality, the agents were totally dependent upon the employer and were in effect employees of Renovo. As employees, they were entitled to payment for overtime hours worked.

1. <u>FLSA Definition of Employee</u>

Under the FLSA, an employee is "any individual employed by an employer." 29 U.S.C. § 203(e)(1). To "employ" is "to suffer or permit to work." 29 U.S.C. §203(g). The FLSA's definition is broader than the common-law definition used by other statutory schemes. For example, the FLSA has broader coverage than ERISA, which relies on traditional agency-law principles to determine employee status.[13] The definition of employee is to be determined in light of the purposes of the legislation "so that 'employees' are those who, as a matter of economic reality, are dependent upon the business to which they render service."[14] The multi-factor economic reality test looks to whether the putative employee is economically dependent upon the principal or is instead in business for himself. The test is a loose formulation, leaving the determination of employment status to case-by-case resolution based on the totality of the

---

[13]*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)

[14] *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 145 (6th Cir. 1997).

11

circumstances.[15] In *Donovan v. Brandel*[16], the Sixth Circuit considered six factors in determining whether an individual was an independent contractor or an employee covered by the FLSA:

1. The permanency of the relationship of the parties;
2. The degree of skill required for the rendering of the services;
3. The worker's investment in equipment or materials for the task;
4. The worker's opportunity for profit or loss, depending on his skills;
5. The degree of the alleged employer's right to control the manner in which the work is performed; and
6. Whether the service rendered is an integral part of the alleged employer's business.

An examination of these factors, with even the preliminary evidence offered with this motion, indicates substantial support for concluding that the repossession agents are employees subject to the FLSA's requirements.

2. <u>Analysis of Factors</u>

a. <u>Permanency</u>

Permanency tends in favor of Plaintiffs. Plaintiffs Yarbrough and Whitmer worked for Renovo for five years, Gentrup and Jones for three years and Schwartz, for over two years. All were employed on a full-time exclusive basis. The independent contractor agreement (IRCA) contains no term of duration, making it for an indefinite period subject only to a 10-day cancellation clause. (Aff. of Gentrup, Ex. 1, §6, Dec. Of Jones Ex. 6, §8.) Only the pay scale contained in the appendix has a term - one year- which may later be altered by the company.

In *Imars v. Tractors Mfg. Serv., Inc.*,[17] the Sixth Circuit found that permanency tended in the worker's favor where he worked for the company exclusively for over two years, averaging

---

[15]*Imars v. Tractors Mfg. Serv., Inc.*, 1998 U.S. App. LEXIS 21073 *7 (6th Cir. 1998)

[16]*Donovan v. Brandel*, 736 F.2d 1114, 1117 (6th Cir. 1984)

[17]*Imars*, 1998 U.S.Dist. LEXIS at *17

12

over 40 hours a week and for the first year and a half, there was no definite term to his service. In *Rumpke v. Rumpke Container Service, Inc.*,[18] this Court analyzed duration of the relationship in the context of whether an individual was an employee for purposes of ERISA. The Court noted that the duration of the relationship is demonstrated to be one of employment when the hiring party retains the right to discharge the worker at any time and threatened termination of the plaintiff upon occasion. Although the IRCA contains a 10-day notice period, Gentrup, Yarbrough and Jones were all fired without any prior notice. (Aff. of Gentrup, ¶ 22; Decl. Of Yarbrough, ¶ 14; Decl. of Jones ¶18.) As FAS, Whitmer sent an email threatening immediate termination for agents who failed to follow the policy on removing the drive shaft from all-wheel vehicles. ( Aff. of Whitmer, ¶ 25, Ex. 9; Decl. of Yarbrough, Exh. 10.)

b. <u>Degree of Skill</u>

The job vacancy postings of Renovo indicate that prospective employees need only have a high school diploma, clean driver's license and the ability to use a computer. The agents receive on-the-job training by riding with another driver or with a Field Agent Supervisor. (Aff. of Whitmer, ¶8; Decl. of Jones, ¶6. ) Agents receive copies of policies describing their duties and attend yearly training conferences. Their work is relatively routine; locating and repossessing vehicles. A lack of required skills or knowledge is indicia of an employer/employee relationship.[19]

c. <u>Worker Investment</u>

The investment of repossession agents is minimal. Agents are required to have a cell

---

[18]*Rumpke v. Rumpke Container Service, Inc.*, 240 F. Supp. 2d 768, 773 (S.D. Ohio 2002)

[19]*Bonnetts v. Arctic Express, Inc.*, 7 F. Supp.2d 977, 981 (S.D. Ohio 1998)

phone and access to a fax machine and computer, but their investment in any tools or equipment is minimal Examples of items purchased are wrenches, maps, jump pack, lock out kits, and Fix-a-Flat. (Decl. of Jones ¶ 7; Decl. of Schwartz, ¶ 10. Aff. Of Gentrup ¶ 15.) The company encourages agents to buy lap tops and in 2006 offered to purchase them for the agents and allow them to pay them off with a $25.00 per week deduction from their paychecks. Former agent Jimmy Yarbrough took advantage of this offer. No deductions were actually made indicating the lap top was for the company's convenience. When he was terminated, Yarbrough was given the choice of returning the laptop or buying it. (Decl. of Yarbrough, ¶8.)

Most agents drive company trucks. The fuel, repair and maintenance costs, as well as insurance, are paid for by the company. Beside minor items, there is no required investment in capital. The IRCA specifically states that no capital investment is required. (Decl. Of Jones, Ex. 6 , ¶4.) In *Rumpke,* the Court cited Restatement (2nd) of Agency, Section 220(2)(k) for the proposition that where the hiring party furnishes significant tools, materials and other equipment, this tends to show the existence of an employer/employee relationship.[20] This factor tends to show employee status.

    d. <u>Opportunity for Profit or Loss</u>

Agents were paid a flat rate for each repossession and could increase their compensation by increasing the number of repossessions. Although this may sound like the opportunity to increase profit, in effect, it is no different from any piecework system. The flat rate system

---

[20]*Rumpke,* 240 F. Supp.2d at 772-73

differs from a commission-based system. The Agent bears no risk of loss. They are paid for a repossession without regard to whether the employer loses money or makes a profit on the job.[21]

The number of assignments received by the agent was determined by the company. No matter how efficiently an agent performed his work, he could not increase his income beyond the number of assignments. The agents did no marketing or advertising for repossession services and were told not to talk to the customers. Their only contact with customers was indirect, inputting various update reports on their efforts to repossess vehicles.

Agents are hired for specific geographical areas, but their territories may be redesigned at the option of the employer. For example, Jimmy Yarbrough had his Western Kentucky territory divided several times. Territories were revised if management believed it would enable agents to meet the company's numerical goals. (Aff. of Yarbrough, ¶¶ 2 and 11, Ex. 3). Orders were shifted to another agent if managers thought the collateral could be repossessed. Fred Schwartz, who drove his own vehicle, quit when he discovered that other agents were given the same orders in his supposed territory. (Decl. of Schwartz, ¶17.) He had earlier been threatened with loss of orders if he did not meet recovery goals. (Decl. of Schwartz, ¶ 14.) The agent's access to the truck, and thus ability to increase profit, was restricted by involuntary assignments of second agents to the trucks. (Decl. of Jones ¶ 14 : Affidavit of Gentrup ¶ 21 ).

In *Rumpke*, the Court concluded that the individual was an employee notwithstanding that he was paid by commission based on other factors present in the case.[22] Counterbalancing

---

[21]See *Cavozos v. William Foster Co.*, 822 F.Supp.2d 438, 443 (S.D. MI 1993). Migrant workers paid for what they picked regardless of owner's profit or loss distinguished from workers receiving a percentage of the sale proceeds.

[22]*Rumpke*, 240 F. Supp.2d at 774.

15

payment by commission was the employer's control of the instrumentalities and tools and control over the route, which it could increase or decrease at will, increasing or decreasing the employee's compensation. The Court felt that flexible control over the employee's payment cast doubt upon the label of such payment as pure commission. The defendant ultimately reserved control over payment.

In this case, Renovo maintained control over the routes served by the repossession agents, changing them at will in the case of Yarbrough, or limiting the access to the truck, as in the splitting the truck of Jones and Gentrup. Orders could simply be reassigned. The ultimate control over the income of the repossession agents shows an employer/employee relationship.

e. <u>Right of Control</u>

The evidence provided by the Plaintiffs show the exercise of substantial control over the manner in which the work was performed. As an example, "Be A Professional," one of the polices sent to agents by Leah Lawrence on February 9, 2007, gave detailed directions on obtaining information on orders to complete the update forms. There are scripts of proposed conversations with the debtor and instructions on filling out condition reports and pay sheets. (Aff. of Yarbrough, Ex. 9.) The agents did not have any role in advertising, marketing, or pricing of the company's services. They did not deal directly with the customers. The appendix to the 2006 IRCA describes precisely how the job is to be performed. The emails to agents tell them how long they are expected to be on the road and how many units they are expected to recover.

In *Rumpke*, this Court found that the right to control manner and means tended to show employee status. In *Rumpke*, the defendant owned the customer routes, the trucks and equipment with which waste disposal was accomplished, controlled management of routes by reserving the

16

right to change routes, set days and times of services, provided written work instructions, disciplined drivers and impeded the plaintiff from operating an outside business. All of these same factors are present here.

Kentucky Employer's Mutual Insurance (KEMI), which administers the workers compensation claims of Renovo in Kentucky, has determined that Plaintiff Jimmy Yarbrough was a covered employee for purposes of payment of medical bills and total temporary disability benefits. Decl. of Yarbrough ¶ 16 . Yarbrough was injured on March 16, 2007, while attempting to repair the company truck. A copy of his notice of benefits is Exhibit 13 to his declaration.

f. <u>Whether service rendered is an integral part of the employer's business.</u>

In the job opportunities announcements contained on its website, Renovo characterizes the work of the repossession agent as, "an essential part of our business and is paramount to our continued success." (Aff. of Gentrup, Ex.4) Renovo is in the business of providing collateral recovery and accomplishes this goal through the work of its repossession agents.

Plaintiffs believe that during discovery they will find additional evidence supporting that the repossession agents were economically dependent upon Renovo and thus subject to the FLSA. For purposes of conditional certification, however, the burden upon Plaintiff is relatively slight.[23] The FLSA is designed to be broadly remedial and humanitarian statute. The Act's definitions are construed liberally to effectuate the broad policies and intentions of Congress.[24] It is crucial to remember that the first tier notice analysis which takes place prior to discovery and

---

[23] *Smith v. Lowe's Companies, Inc.* 2005 U.S.Dist. LEXIS 9763 *13-14 (S.D. Ohio 5/11/2005).

[24] *Dunlop v. Carriage Carpet Co.*, 548 F. 2d at 144

17

results in conditional certification of the FLSA class is not the appropriate time to undertake the more detailed second tier analysis of determining whether the lawsuit will ultimately proceed as a 216(b) collective action.[25] The agents should be promptly apprised that a case is pending so they can decide whether to join, otherwise, their claims will be barred or diminished by the FLSA's statute of limitations.

## IV. REQUEST FOR COURT SUPERVISED NOTICE

The District Court has the discretion to authorize the sending of notice by plaintiffs to potential class members in an appropriate case. Plaintiffs have established that they are similarly situated to other agents for whom notice is sought.

### A. The Notice Period

The Plaintiffs are all former agents of Recovery One and are clearly similarly situated to other Recovery One agents. Their duties and pay practices did not change appreciably with Recovery One's acquisition by Renovo in early 2005. The complaint alleges that the violation is based on willful conduct so the FLSA's three year statute of limitations period would apply.[26] Notice is requested for Recovery One agents employed during the previous three years, even thought this period precedes acquisition by several months, since Renovo would be responsible for its predecessor's liabilities. The issue of willfulness cannot be determined at the notice stage and therefore notice should be directed for the full three-year limitation period requested.[27]

---

[25] *Goldman v. Radio Shack Corp.*, 2003 U.S. Dist. LEXIS 7611 at *27-28 (E.D. PA 4/17/03); *Thiessan v. GE Capital Corp.*, 267 F. 3d 1095, 1102 (10th Cir. 2001)

[26] 29 U.S.C. §255.

[27] *Roebuck v. Hudson Valley Farms, Inc.*, 239 F. Supp.2d 234, 240 (N.D.N.Y. 2002)

Plaintiffs' preliminary evidence shows that with their acquisition by Renovo, the repossession agents of the two other subsidiaries, Cyber Asset Recovery and Ascension Recovery, became similarly situated to the Recovery One agents. Plaintiffs have requested the dates of acquisition in their first set of interrogatories served August 31, 2007. Notice should be directed to agents employed by the these two subsidiaries following the dates of acquisition by Renovo Services.

B. <u>Proposed Court-Ordered Notice</u>

Plaintiffs have filed with this Memorandum as Exhibit 3 a proposed Court-Ordered Notice of Lawsuit. The Plaintiffs request that the Court approve the sending of this Notice to prospective opt-in plaintiffs.

To effectuate the opt-in process, it is requested that the Court direct Defendants to furnish to Plaintiffs' counsel, the names and last known addresses of the members of the potential plaintiffs.[28]

V. CONCLUSION

For the reasons described above, the Plaintiffs respectfully request that this Court conditionally certify the proposed FLSA class and implement a procedure, set forth in the proposed Notice to give potential opt in plaintiffs notice of this case and an opportunity to join this lawsuit pursuant to FLSA 29 U.S.C. § 216 (b).

---

[28]The Plaintiffs served their First Set of Interrogatories requesting this information on August 31, 2007.

Respectfully submitted,

s/Bruce H. Meizlish
Bruce H. Meizlish #0033361

s/Deborah R. Grayson
Deborah R. Grayson #0062777
MEIZLISH & GRAYSON
Attorneys for Plaintiffs
830 Main Street, Suite 999
Cincinnati, Ohio 45202
(513) 345-4700
Fax (513) 345-4703

## Certificate of Service

I hereby certify that I electronically filed the foregoing Memorandum, providing electronic notification to all counsel of record.

s/Bruce H. Meizlish